with the first matter on today's argument to the calendar United States v. Rhodes 21-2236. Counsel. Good morning your honors. May I please the court my name is Robert Moore and I represent the defendant appellant Jason Rhodes. Disgorgement of ill-gotten gains that is the target of $400,000. Now the forfeiture order here was for $25,400,000. It's a $25,000,000 increase. Now this is plain error. And the $400,000 that's the money that you're saying went into your client's pocket. Yes. But there is lots of money that went to pay other customers of Sentinel right? Yes. That went to investments that didn't pan out or other things like that. Yes your honor. Why isn't that money that he had control over? He was an officer of Sentinel. Well it depends on the account. So we have the Bank of America account which is Sentinel. That is completely dominated and controlled by Verace. The government did not introduce a single shred of evidence that Rhodes ever touched that account, even had access to it. But there was another account. There was the Whedon account your honor. That's the prime Is that not the account from which most of the client funds were misappropriated? No. Allegedly. The account from which the client funds were misappropriated was the Bank of America account. So in practice what happened, there were three ways that Verace could steal funds. The first way was you have investor funds deposited into Bank of America. You don't put funds at all into Whedon or you only put a portion of them. Now as to those funds, because Rhodes never had control of the Bank of America account, they shouldn't count against Rhodes for forfeiture purposes. So that's the first method. The second method is funds are deposited into Bank of America. They are then sent by Verace to Whedon. Rhodes is the sole signatory on the Whedon account. Verace submits redemption requests to the Whedon account bearing Rhodes's name. So the funds went from the Bank of America account to the Whedon account? Yes. Okay. And how much are we talking about? Well on the government's estimate we have, I think it's it's roughly 25 million or a little bit there under. That's where the number comes from? Yes your honor. Okay. So at some point everything or for our purposes the relevant amount goes through from the Bank of America account to the Whedon account. Is that right? Well how the government calculated the amount is really complicated. I appreciate it. That's why I started off. No, no. I understand your honor's point. 8005B in the record, that's the most important exhibit here. So it is unclear to me just based on that exhibit if the government actually... But what page is that? That's is that 499? I've got 499 and 500 but maybe that's not what you're talking about. It is on A505. I apologize, A503. Let's look at A504. So if you look at A504, what happens here is the of America. Now we don't have the methodology here for what money went into Whedon and then was sent back. That's the second method of Verace's misappropriation. Or the money that just went into Bank of America and never made its way to Whedon. So if the government's hook here, the government's hook here is Rhodes's alleged control over the Whedon account. That in and of itself would not account for the funds that went to Bank of America and never made it to Whedon. Because that's the way that they accounted for client funds, all transfers went through the Whedon account? No, your honor. Sometimes Verace would not send the full amount into Whedon. But you said the $25 million eventually. And there's obviously a dispute, but for now we've got a record. Eventually went from the Bank of America account to the Whedon account. Is that correct? I do not know, your honor. It's not clear on this record. What we have here, the government's calculation is you have deposits into Bank of America. Let me ask you this. Is there something in the record that shows that Verace made a disbursement from the Bank of America account where the money never traveled through the Whedon account? Yes, there are. The government introduced into evidence the bank statement. So on remand, we could calculate that amount. Okay. So that is the first method. Can I clarify one thing? Just on this 504? Yes. When you're saying you don't know, this shows more than $20 million direct deposits, direct deposits into Whedon. Doesn't that get you well above the forfeiture amount? Which column are you looking at, your honor? I apologize. The very first column. The top says direct deposits into Whedon. No, your honor. The direct deposits into Whedon, this Seroff amount, that's not part of this case. I don't think the government... The Seroff isn't, but the Flatiron is, and that's $6.1 million there, right? Am I misunderstanding that? Yes, that's $6.1 million. And that clearly went through the Whedon account? Yes, your honor. So that's already getting us pretty close to our forfeiture amount? No, that's $6 million. Forfeiture was $25,400,000. Got it. So the first method is funds never even went into Whedon. The second method is funds went into Whedon, and then a redemption request was submitted by Varachi bearing Rhodes' signature. So at the top before, this is the question. So we've got United States decontamination. We've got some other summary orders, at least one, that suggests that if, at least in this case, a defendant is the sole signatory of an account and funds go through that account, then the funds are under his or her control. Would you agree with that? No, your honor. It's not just the fact that somebody is a sole signatory. You have to show control and domination. Control and domination. So if I'm the sole signatory of my account, and no funds can be dispersed from that account without my signature, why isn't that a sufficient level of control? I understand, your honor. There's not a gun to my head. There's just, I either sign or I do not. And how do you then distinguish what we said in Contravenous and the whole line of cases prior to Contravenous, where we said just having control over an account is enough for purposes of determining the forfeited amount or forfeitable amount? I understand, your honor. It's a great question, and I want to address it right now. In terms of being the sole signatory, I understand. Funds could not have been dispersed from Whedon, but for Jason Rhodes, his knowledge. Now, when you look at the reality of these facts, what really happened here, Virachi would submit the request to the prime broker. Sometimes he forged Jason Rhodes' signature. Sometimes Jason Rhodes was CC'd on an e-mail. Sometimes when Virachi forged Jason Rhodes, actually, supposedly all the time, Jason Rhodes would get a call from the prime broker verifying this amount. Virachi is the driving force here. Wasn't this all the subject of the federal hearing? It was, your honor. And wasn't the district court judge, unlike the three of us there, to observe the testimony and to have a better understanding of the nuanced factual evidence that you're now reciting to us? In other words, I think the standard of review is, is this some sort of abuse of discretion? Tell me why we should replace our own view, or your view, frankly, of the evidence with the district court judge's. Because fundamentally here, we have a $300,000 or $400,000 gain, ill-gotten gain. That's the amount. The actual district court federal order said that was the amount that Rhodes got. That's the amount that ended up in his pocket, right? Correct. But let's say the facts were clear that he actually was in control of the funds and participated fully in using them to cover up with other investors, whose funds had already been misappropriated, all of that money. And so, like, he used the money for the purpose of furthering the scheme and was in control of it. It just didn't go directly into his pocket. Or he invented it somewhere and it didn't pan out. That would still be money that he was in control of, right? That's not in dispute, your honor. And I agree, there is second circuit. So it can't just be that whatever he profited, as opposed to what he controlled and used in a proper way, that's the proper amount, right? No. Yes, your honor. I fully agree. But the real issue here, what distinguishes this case from the other summary orders that the court just referred to, is Rhodes did not control the Bank of America account. You're saying he didn't control these funds because Verace was the moving force. And you argued that Rhodes didn't really know what Verace was doing with the money. But the district court found otherwise, right? No, that's just not. So we'd have to say the district court was wrong in that finding. No. That actually Rhodes did not know what Verace was doing. I disagree, your honor, respectfully. I think what this court has to do is say, because Rhodes did not control or dominate the Bank of America account, irrespective of his knowledge, that is the reason why the amount is not forfeitable. Can you help me understand, part of this has, I think, I'm struggling with the relationship between the Fatico hearing and the court's findings there and the question before us. Am I right that the Fatico hearing was really on the losses for purposes of sentencing, not forfeiture? And so the question the court was looking at is the reasonably foreseeable losses, rather than the specific sort of honey cut question about who came into possession or control of how much through the course of the conspiracy. Am I misunderstanding that as the focus of the The Fatico hearing was about a broad array, as the government stated, a broad array of factual issues, including Rhodes' role, his knowledge, his participation, all of these things. But in our arguments, we were focused on loss amount. Loss amount was key. And loss amount is different from forfeitable amount? Yes. Okay. And so am I right that with respect to the question of whether you raised the Fatico hearing covered some of the same ground, but the court was not specifically asked to make a finding as to whether your client came into possession and control of a particular amount for purposes of forfeiture? That narrow question was not specifically before the court. So am I right that we're on plain error review here? Yes, Your Honor. And am I right that we don't actually have any district court findings that we're reviewing for plain error because the court didn't address the specific issue? We're asking ourselves whether this rises to the level of plain error based on our assessment of the record. Yes, Your Honor. Okay. Thank you. All right. Thank you very much. We'll hear from the government. Thank you. May it please the Court. My name is Jared Leno. I'm an assistant U.S. attorney in the Southern District of York. I represent the United States in this appeal as I did in the district court. I just want to start by addressing the last colloquy. I think this is just a plain error review case. This is a waiver case. There's colloquy between the judge and defense counsel. Myself, the prosecutors handed up – had handed up a forfeiture order, said based on conferring with the defense that there was no dispute as to the forfeiture order. The judge that engaged in the forfeiture order said that there was no dispute as to the forfeiture order. The defense counsel said no objection. That's right, Judge. And so it was specifically flagged – the district court specifically flagged this forfeiture order to the defense counsel. The defense counsel said no issue, no objection, no dispute. And, Judge, that's why we don't have a more fulsome record on the forfeiture facts because the defense waived the issue. Well, why isn't – when you say waive, I think of a voluntary and knowing waiver of a known right. When I think of forfeiture – and now I'm talking about forfeiture in the preservation sense and not in the money sense – I think of failure to object. Why isn't this just a straight-up failure to object? I think, Judge, those of the forfeiture cases deal more with just not raising the issue more as opposed to an affirmative. The district court allocutes someone on, do you have any issues with this? Do you want to raise an issue here? It was raised and the answer was no objection. Right. And I think there's – it's kind of hard to imagine what more could have been done by the government, by the court, to kind of put – one could imagine the judge saying, are you sure, are you double sure, that sort of thing. But, I mean, obviously, that's not the kind of thing that a judge should be required to do below. And so the issues were specifically raised. And the whole point of this doctrine is it's an issue of sandbagging, that now we have – Your Honor has asked the defense counsel about the record. There was no developed record on the issue of control or acquisition under the forfeiture doctrine and has asked for a remand on these points. Well, there was a point in time where the district court just specifically flagged that issue and asked, essentially, do you have any issues here? Was the issue of control not at all raised? In other words, at some level, factually, there were issues of signature control that were raised during the fatiguing hearing. There were issues of the relationship between the two co-conspirators that were also raised, all of which – at least they have some bearing on the Honeycutt issue. Would you agree with that? I would agree that they're – these issues are kind of factually related. There is factual overlap. There certainly is factual overlap in the sense of both the kind of technical issue of who is a signatory on the accounts, the more functional issue of how they were used, I think would be facts that one would probably also look to for a control or acquisition analysis in the forfeiture doctrine, but they are distinct, right? Just because you have some facts and they overlap, there may be, for example, two different co-conspirator statements and one is challenged and one is not. One may still look to some related facts about the conspiracy, but they're different statements. It's a different distinct, have some facts that you might look to in common. It is on the party to raise that separate distinct issue. So I think the fact that there might be some factual relationship, some similar facts that you look at, is not – doesn't bear in the waiver analysis here. In the waiver analysis, a little bit earlier in the hearing where you're describing the waiver, the question was, and this was, again, with respect to the loss amount, I recognize, rather than the forfeiture amount. The question was any objections other than those which we put forth prior to the Fatico hearing and the Fatico hearing itself. We had no further objections. Is that enough to preserve the forfeiture challenge? No, Judge, it's not. Because, again, the judge specifically raised the forfeiture issue, which is a distinct inquiry, and the defense. That was one the issue shouldn't have raised. The idea of remanding at this point for kind of a factual inquiry. So if there had been a more substantial evidentiary hearing on the forfeitable amount, forfeiture amount, which can be done in a context, I guess, of a quasi-Fatico hearing, and thereafter the colloquy had occurred where counsel said I have no objections to the ultimate forfeiture order, would that qualify as a waiver in your view? Judge, if there had been – I think to preserve the issue for it not to be a waiver, you have to raise that specific issue of forfeiture. So that's it. So that's what I thought you were saying. So you could have a fight. You could have a second fight, a third fight. But you've got to continue to object in the government's view to the ultimate order. So, Judge, I think – because I don't want to be hyper-technical here. I think that, like, we're not – this isn't kind of a gotcha approach. I think the point is these inquiries are different. When you're talking about, as Judge Robinson said, loss amount and those sorts of things, it's a foreseeability analysis. It's legally distinct from the issue of control or acquisition. I'm leaning away from the hypothetical and just saying let's say that this was a hearing about forfeiture. And ultimately, the question from the district court judge was, do you have any objections to the final forfeiture order? And I've just fought. I'm defense counsel. I've just had these fights. Well, no. I know that I'm going to lose, obviously thinking that I preserved the issue given the prior dispute. Sure, Judge. And I think – obviously, I have it in my answer by saying those aren't the facts here. But I think in the hypothetical – I understand that. But in this hypothetical, I think in all likelihood, we would not be raising this argument. If there was the issue of forfeiture was flagged, this issue broadly was raised, I think that's a distinct case. And obviously, each case is different. Well, I would think you would say it depends on what he said. So if he said, well, we continue to object and we accept your ruling, then maybe there's an objection on the record. But if he says, oh, we're persuaded and we no longer object, that would be a forfeiture. I think that's a more precise answer. I mean, that is the answer. I guess my point is, Judge, I don't want to be seen to be taking some kind of hyper-technical approach where, you know, someone – everyone in the courtroom thinks an issue has been preserved, any reasonable person would look at it, and I'm saying, aha, you didn't – there was some kind of linguistic – you know, one word wasn't spoken at some point in time, but everyone knew what they were talking about. So I'm just trying to say that I'm not trying to take a hyper-technical approach here. Here, though, I mean, the issue was specifically flagged. There was no hearing, fatico or otherwise, on the forfeiture question. So that scenario, Your Honor, put forward, which would raise a closer question and very well result in us not making a waiver argument, that's not what we have before the Court now. Well, given the possibility, we might proceed to consider the question. Could you maybe address this idea that Rhodes did not control the Bank of America account and, therefore, the forfeiture order is inappropriate? Yes, Judge, I'd like to do that. So I think it's important to step back and just start with the facts of Honeycutt to frame this issue. In Honeycutt, the issue was a store selling essentially meth precursors, methamphetamine. And the person against whom the forfeiture order issue was entered was an employee of the store that had no ownership interest, no control. It really was a small fish. Here, by contrast, just to step back again on the facts of this case, Jason Rhodes is one of two co-founders of Sentinel. He had high-ranking executive roles. The testimony of the fatico was that they made decisions in concert. He was, Judge Stein ruled, a full and knowing member of the conspiracy, knowledgeable and a participant in all aspects, at least in terms of discussions. True, there were some aspects that were executed on by different individuals. But the finding by Judge Stein was really that this was a robust, high-ranking member of this conspiracy who was fully aware of where its tundra was led. And so this is not a Honeycutt scenario. And so there are also the points of, and Honeycutt, I mean in the sense of a low-ranking individual who didn't have control, who didn't, you know, pocket substantial sums. But control is the only thing that matters, right? If he was not low-ranking, but actually only Verrocki had access to the accounts and he took money out of the accounts and put it directly into his pocket, and Rhodes never controlled any of the misappropriated funds, then Honeycutt would still apply, right? Well, I mean, obviously, Honeycutt, the doctrine, would apply and we'd have to go through the facts. But I think, Judge, so, I mean, two points. Yeah, I understand. But I mean, it would, it would apply in the way that he wants it to apply. Yes, Judge. And so I think, I think two points here. First, on the facts here, both of the relevant accounts, one of them Rhodes had exclusive domination and control over, and the other one, he was a signatory in the account, right? But on top of that, I think it's the issue of his role in the company, even though someone might not be, I mean, look, when a bank holds your money, it's the bank holding it and not you. The point is you have control over it functionally. And Rhodes and Verrocki engaged in this conspiracy together. There's their desk where they sat like six feet across from each other. There was extensive testimony about decision-making in concert as the two principles were sensible. And so we do have him on both accounts. But even more significantly than that, these were two individuals, two men, who engaged as significant, high-ranking partners in the same conspiracy. That feels like it's, it's kind of ignoring the lesson of honeycut, which is that there's a difference between co-conspirator, co-conspirator liability for losses and sort of the joint and several and foreseeability and everything that you're describing and the findings that the court made and the narrower question of possession and control, which is what's going to drive the forfeitability. So why does the level of knowledge of what's going on tell us anything about the forfeitability of the money? Yes, Judge, I see I'm out of time. If I could answer the court's question now. Of course. Okay, thank you. So they are just thinking, Korea's judge, but the point is here they dovetail. And it's not, I'm not saying that, well, just because something was foreseeable and, you know, you'd be liable as a co-conspirator and for guidelines purposes, therefore, the same form for Tremont applies. Clearly, honeycut says that's not the analysis. But my point is that it's not just the foreseeability, but he had participation. The testimony to Fatico extensively of Mr. Faraci over the course of almost a day of testimony was that Rhodes was making these decisions with Mr. Faraci in concert. It's not just that he knew about them in the same way that, and honeycut has these hypotheticals about, you know, a college drug dealer working for, you know, some kingpin. And clearly the court is troubled by the idea of this low-level college student is only selling like $1,000 worth of marijuana. You know, he's not, it might be foreseeable to him that the conspiracy is selling more, but he has a small piece. Here, Rhodes and Faraci, it's not just foreseeable to Rhodes, but Rhodes is the decision maker along with Faraci. He's on both. Who cares? So he's the control over these accounts. And so the funds, the misappropriated funds were never in his control. Then wouldn't that pose a problem under honeycut? If they were not in control, then yes. Maybe we should talk about control. So is it the case that the Bank of America account was not controlled by Rhodes and Faraci could take money out of there without Rhodes ever knowing, and he did so in furtherance of the conspiracy? So I think the testimony was from Faraci is that they, Faraci said they discussed these things. So I guess my point is that The testimony was what? They, sorry, that they explicitly, Faraci and Rhodes specifically discussed how to use these funds. And so Faraci and Rhodes Does that qualify as control by the defendant here? The way this operated, yes. Because it's not just an issue of, well, Faraci could do these things without telling Rhodes. That's not, those aren't the facts here. The facts were that Rhodes and Faraci in concert decided to siphon these funds. So even if it was Faraci, first of all, they're both signatories on the operating account. That's point one. That seems to me, you may be complicating this a little bit, and I say this with great respect. That seems to me to be the fundamental factual issue. Is he a signatory? Does the fact that he is a signatory on these qualify as control, the sort of control that Honeycutt would recognize as control for purposes of making the funds within that account or those accounts forfeitable and subject to a forfeiture order? I don't know in this case whether that we need to get into all of these other issues that you're describing. I've been very focused on, is he your friend on the other side seems to suggest maybe it is. Is that under our case law enough? So contravenous is an example of that. Or do we require more? Sure. So, Judge, I want to make sure I answer your honest question directly. On the facts of this case, the fact that Rhodes is a signatory along with Faraci on that bank account. Which bank account? Let me just kind of step back because I want to make sure I'm precise here. On the Wheaton account, Rhodes has exclusive control over that. So I think that issue is kind of obvious and clear. And how much money goes, how much money went through that Wheaton account? So I think there was approximately $36 million. How do I know, how do I tell that based on this record? So, Judge, there is, the Brattle Group testified at the Fatico hearing and they created a number of charts. They added up in one of those charts the number of redemptions submitted by Mr. Rhodes to the Brattle, to Wheaton. And the number totaled $36 million. So the $25 million figure comes out of money that comes from the Wheaton account? Can I ask you this question? Is it your position, is Rhodes being held liable for a forfeiture order for funds that did not come from the Wheaton account? There were some funds, Judge, that went into the Bank of America operating account and some funds were siphoned off before they went to Wheaton. Before they went to Wheaton? That is correct. So there are some funds. And the way that we got to the $25 million figure is for both the Wheaton account and the Bank of America account, inflows were added up from each investor and then outflows to each investor and those were netted and the total was $25 million. So there were some funds. I think in terms of the call we're having now, I guess the key issue for the court seems, I think, undisputed that the Wheaton account withdrawals, those were Rhodes' account. He had exclusive dominion and control over it, the closer question... It's more than him just having control over the account, right? So if he's a signatory of the account but somebody else could take money out of it without him knowing and they do so, it doesn't mean that he's in control. You have to be in control of misappropriated funds, right? Sure. The fact that you're a signatory on an account where funds rest properly wouldn't make you liable for a forfeiture when anybody misappropriates funds from that account, would it? So the Wheaton account, he was the only one who could authorize... Right, so that's the thing, right? Is he the only one who could misappropriate funds from that account? For Wheaton, the answer is yes. Right. Now, Bank of America is, I think, a closer question than the question that courts... It's the more complicated. Yes, the more complicated question. And I think I don't mean, I think I articulated this perhaps not as clearly last time and I just want to try again because I do think it's a critical point here. So there is a signatory authority. Now, Your Honors have asked, well, is that enough on its own if it's kind of a technical signatory authority? But you don't look at the account, you don't know what's going on. That would be a close and difficult question, but it's not the question here. And I want to be clear, what I'm about to say is not part of a foreseeability analysis, it's part of a control analysis. And the point here is, Verrachi was indeed, as we conceded below and we concede here to be clear, the one who on a day-to-day basis functionally was the one who was really in the Bank of America account and kind of sending money here and there. That was Verrachi's primary role, or one of his roles was he was the Bank of America account essentially operator. Well, it was a signatory, he could have taken money out, but two facts here. One is, he knew what Verrachi was doing and they discussed this and acted in concert to execute upon it. So yes, he might have been the tip of the spear when it comes to the Bank of America account, but they were controlling it together. Now, Verrachi was the one who would, I guess, you go online, you click on into the webpage or whatever, you send the pay expenses for some of the people. So effectively, he controlled it because he could have stopped it. Is that what you're saying? He could have stopped it. He's born in and with Verrachi and he knows that Verrachi is misappropriating the funds and he's on the account. He could say, no, you can't take out this money, I'm going to contact the bank or something like that. I mean, I think he could have done that, but, Judge, it's more than that. It's that he affirmatively with Verrachi made the plan and decided to have Verrachi take these funds out, right? So they're acting in concert. Again, not a foreseeability issue. You know, this isn't an issue of, again, kind of the low-level marijuana dealer. They were acting together to... So this is a... So, okay. So there are somewhat more complicated circumstances, factual scenarios where the fact that someone is a signatory may not be enough and you need a little bit more and then it bleeds into factors that, for example, we consider in connection with loss causation and foreseeability. Right. So, I mean, one could examine a hypothetical, not present here, where someone is on an account and then 10 years later, a fraud scheme starts and that person's not looking at bank accounts and so forth. It's really a technical matter. But here, the testimony at the Fatico, and again, this is not dispute or an appeal, it's a settled issue, is that the two men really acted fully in concert. There was complete transparence between them. And more than that, they were acting together to do these things. But to answer his question, if they act in concert about the conspiracy, but the agreement is to take money out of the account and put it directly into Verace's pocket, so that, you know, it goes from the corporate account into Verace's pocket and Rhodes never has access to the funds. I mean, he's part of the conspiracy, he's a co-conspirator, but we know that that's not enough. Why should he be liable for forfeiture if the funds were always in the control of Verace? So I think that in terms of the control of Verace, I would say that Rhodes did have control because they were acting in concert. It wasn't something where Verace was off doing his own thing, unbeknownst to Rhodes. They really were hand-in-glove operators. Right. So literally what happens is the money's in the corporate account, and then they press a button and the money is in Verace's personal account. But you're saying because they made the decision to press the button together, there's a split second or something in which Rhodes is in control of those funds? Well, I wouldn't view it as a split second, Judge. I would assert that the entire conspiracy period when they were acting in concert, kind of whether they kind of are, both put their finger on the mouse button together or one is doing it, I think, is kind of a technicality. They're operating as agents of each other. And again, not to the foreseeability analysis, but the point is what they're doing is a deeply entwined acting in concert throughout the length of the conspiracy. And again, there was an extensive Fatico hearing on this, both the cooperating witness, Verace, as well as the financial. But you don't have, well, I'm not aware of a precedent from the Second Circuit on quite the point that I think you're making, but I might be wrong. Anyway, we've kept you well past your time. And I know you've covered this with my colleague, but I just want to be clear. I'm trying to figure out where in the record I find 25 million going through the Whedon account. Forget about the Bank of America account. And you cited somebody's testimony. Is one of these exhibits in the appendix, does it chart that out for us, or do we have to go back to the transcript and reconstruct the testimony to get there? There's an exhibit, Judge, and I just want to find, it's in the 8000 series, and I want to find it for Your Honor. That's 500, or the end of the 400s and the beginning of the 500s? I think that's right. And I can get Your Honor a slide, I just have to kind of just peruse my materials briefly. Let me tell you what we'll do. Well, unless you follow up. No, no, I think you can. So we'll go to here, rebuttal, and then just remind me, Mr. Leno, about the page and provide us with the site. I will. And Judge, if I could make one, this is a 10-second point, but I think it's important. We did confer an in advance of argument, and there's one factual thing that I think the defense is no longer asserting. There's argument about $2 million being held back by Simmons and not sent to Sentinel, and the argument was, well, it's never even hit the Sentinel accounts. That $2 million was actually not included in the $25 million forfeiture number, and so my understanding is that the defense is withdrawing that argument. And so that's on consent. We've conferred, and we're on the same page, I believe. Thank you. Mr. Moore. Thank you, Your Honors. I just do want to confirm that latter point. I alluded to before, there were three methods through which Garacci stole funds. The third method was he and an individual named Stephen Simmons. They duped an investor named Nila Fortino out of $6 million. Simmons and Garacci split $2 million of that $6 million. Only $4 million hit Bank of America. So it's complicated because the forfeiture order imposes joint and several liability on Stephen Simmons, but my colleague is correct. We are not including that $2 million amount in the forfeiture argument. So I was very interested in your answer to Judge Robinson, where you acknowledge that we are in plain error. Now, waiver is a separate issue, but you at least acknowledge that you forfeited the argument with respect to forfeiture by saying that we're in plain error territory. Is that correct? That is what we're saying here, Judge, and I do want to address the waiver argument. There's no waiver here. I mean, the government asks, how could you envision a clearer case? Well, you look at the forfeiture order, it could say on consent. It could be signed by the defendant and the defendant's counsel. It would say, it is hereby stipulated and agreed. The fatical hearing was extensive, but we did not specifically say we are objecting to forfeit, we are objecting to control for the purposes of forfeiture amount at the fatical hearing. I do think that there... So in one sense, maybe you forfeited the argument, but okay. But maybe. But it's definitely not waiver, and that's the crucial key here. Now, I do want to make one thing clear. I do not, I am not arguing that being a mere signatory on a bank account is sufficient to show control. I know no precedent in this circuit that would say that. Now, the government has alluded to these individuals... Yes, and that's just not supported by the record. There's one instance here... That is a factual dispute, right? So you would agree that if they made a joint decision to take money out of the account, regardless of whose name was on the form or on the website or whatever, they would be jointly in control of the response? No, Your Honor, because you have... No, I don't. You have to have independent, individual control and domination of an account for this kind of... So if there are two signatories on the account and they get together and they say, let's take money out of this account and put it toward our business, just literally only one person's name is going to be on the form that takes the money out, right? But haven't they done everything together? No, I don't think it shows control and domination. So really, so the accident of whoever his name is on the form is the only person who can be liable for forfeiture of those funds? No, it's not, it's not an accident. It's... Let me give you a concrete example here, and I think hopefully this helps. There was an incident referred to in the fatical hearing, which the government cites extensively in support of the forfeiture order. But this incident involved Verace going to a place called South Orange, New Jersey. He withdrew just enough, just enough cash, just enough cash from the Bank of America account to not trigger an alarm at Bank of America. I think it's under $10,000 or whatever it is. The government cannot seriously suggest that Verace got on the phone with Mr. Rhodes and said, hey, I'm going to withdraw these funds in South Orange, New Jersey. There's no way you can act in concert... Right, so that's a factual dispute, right? So then you're saying that actually they did not make joint decisions to take the money out, and that's a separate question. That is a separate question. So if in fact Verace had gotten on the phone and said, I'm taking this money out of the bank in South Orange, New Jersey, then maybe there would be control. No, I still don't think it's enough. Well, I just want to separate out these two things. So you still think it's enough. And putting that aside, you're saying the record doesn't show that they acted jointly. Yes. But the district court did think that they were acting jointly. The district court thought that Rhodes knew in total the general scheme of what was going on here. The district court did not find that Rhodes knew each and every misappropriation by Verace. I don't know that the district court has got to do that in connection with loss causation or to the extent that this bled over, as I put it, into the forfeiture analysis. They need to make those findings. But I know my time is almost up, but I just want to make the point again, we have a $400,000 ill-gotten gain here. Purpose of forfeiture is to disgorge the defendant from that ill-gotten gain. So the problem is that once you engage in a conspiracy, then that expands the forfeiture landscape. And I think you agree with that. And if Honeycutt sharpened it a little bit for us and said, but you correct me if you think I'm completely off base here. I don't think I am. But Honeycutt then says, each individual defendant has got to at least, you got to show, the government's got to show that that defendant had some, had acquired or had some control. Now you use the word domination. I don't see the word domination anywhere. That's a sort of a separate analysis, but maybe I'm wrong. But I'm very focused on control, including signature control. All right. There was a Peters case issued by this court, I believe in 2013. It was pre-Honeycutt, but it was cited by the district court decision, which we cited in reply. And that really goes through what it applies to Peters test post-Honeycutt to similar facts. In that case, you had an entity, let's call it entity A, you had two individuals, and it talked about what the people could be responsible for for forfeiture purposes. In that case, the facts were more favorable to the defendant, but that provides a good litmus test for this kind of analysis. Thank you very much. Is there a decision? Oh, yes, government. Judge, the citation, it's at page four of our brief. And the citation we have is to appendix 247 to 50, 499 to 500, and 504 to 510. What was the first one, 240? I'm sorry, 247 to 50, 499 to 500, and then 504 to 510. And that's what we cite for that proposition. And among those sites is a table created by the Brattle Group that lists all the redemptions.  Thank you, Judge. Thank you.